Corrections. Ms. Knellan? Thank you. Good morning. May it please the Court, Council. My name is Kelly Knealan and I am here on behalf of the Secretary of the Florida Department of Corrections. We are here appealing an order that happened in a 2254 habeas proceeding where a district court granted a new trial to Mr. Crosley Green based on an alleged Brady violation by the state. This involved some notes that the prosecutor had made pre-trial which were disclosed during post-conviction proceedings. We believe that the district court erred in a number of ways. First, we claim that this claim was procedurally defaulted in the state court so it should not even have been ruled upon in the federal court. We believe that the district court's factual findings are clearly erroneous. The district court erred in reviewing this claim de novo instead of giving deference to the state court findings and that even if the claim was cognizable and the de novo standard was appropriate, this claim is completely without merit. Let me start out with a question. The state post-conviction court ruled with regard to the specific statements that are at issue here that there was no violation because that evidence would have been inadmissible. Correct. That's an incorrect statement of Brady law, right? No, it's not. That's a statement of they would have been admissible. They're neither exculpatory nor impeaching. They're not evidence. There's a difference in saying it's not exculpatory or it's not impeachable evidence. If you cannot terminate a Brady Giglio claim on the ground that the material in and of itself in the manner that it was withheld is inadmissible because it can lead you to admissible evidence. Let me give you an example. Let's say that this is a different case. It's a hypothetical. It's not this case. The police withhold information in a murder case that a separate suspect has confessed to the murder and what you have is a police report from Detective X saying Mr. A has confessed to the murder. That's withheld. Okay? That report is inadmissible in its current form. It's hearsay. It's a document introduced by an out-of-court declarant for the truth of the matter asserted. But if that document were withheld in a murder case and that would be a material Brady violation, would it not? Yes, it would. So admissibility is not the touchstone. You may have other grounds, but admissibility is not the touchstone of that. May I get back to the procedural bar argument? No. No. Because I'd like you to, you can of course, but I'd like you to answer this question first because if the district court applied de novo review and you say that that was wrong, that de novo review may have been appropriate if the state post-conviction court applied the wrong Brady standard. And so I'm pressing you on why admissibility of the actual document that was withheld is the legal standard for a Brady claim. I don't know any law that says that. Because in this case, those opinions, these are opinions. They're not evidence. Someone saying we have another person who has another opinion, whether or not that would have led to any kind of an investigation. It would not have. Why? Because it was. You could ask him, why did you arrive at that opinion? They would have been, he would have asked the deposition. He would have asked those two detectives, he would have deposed them and asked them, you had an opinion, did you not? That the girlfriend was involved. Why did you form that opinion? You said that the girlfriend told you that she tied the victim's hands. Why did you come to that conclusion? None of those questions were asked. Because none of that is true. You're assuming that. I'm not assuming that. We know from the record that neither of these deputies ever talked to Kim Hallett that night. That doesn't. They're trying to tell us that the record conclusively shows that an investigation, why did you do this, that and the other thing, would have revealed nothing. Correct. They were deposed. They were asked what they did. They showed up at the scene, they administered first aid to the dying victim, they collected a firearm, they roped off the scene, and that's all they had to do with this case. They never did any of that. It was alleged that this whole kidnapping incident started. These two deputies never did anything in this case except act as first responders. What about the affidavits they submitted afterwards? The affidavits they submitted afterwards, well first off they were 20 years afterwards, which again gets back to my procedural default argument, because by the time those were presented to the state court, that was expressly found to be procedurally that wasn't already known. We found Mr. Flynn lying down. He was lucid. When I asked him several times who shot him, he only responded he wanted to go home. That was all admitted at trial. Then he died. Suspicious facts, she drove from the Orange Grove all the way to the Oak Park trailer park, which is more than two miles from the Orange Grove scene. Between those places she could have stopped other places to ask for help. That was all admitted at trial. What do they say about the tying of the hands? There was nothing about the tying of the hands of these affidavits. So that statement was never produced? That statement is in Deputy Walker's police report because that statement was made to Deputy Walker as a witness at the evidentiary hearing. They did not call Deputy Walker. When was that report produced? I don't know when it was produced. When was it written? I believe it was the night of the incident. 1999, right? No, no, no. That's a different report. That was an investigation that the FBI did. I thought Detective Walker's report, the one that talks about the alleged tying of the hands, was written in 1999 according to the briefs. No. When was that report written then? Deputy Walker did a report the night. Defense Counsel had that report. I'm not denying that he wrote one the night. The one that explains the theory that the girlfriend tied the victim's hands. When was that report prepared? I don't really know which report you're... I mean this was based on the prosecutor's notes. And that said the girl tied his hands or she said she tied... H said she tied his hands. And that's not in Detective Walker's report? Yes, that's... So I'm asking you, when was that report by Detective Walker with the information about the tying of the hands prepared? The night of the crime. And that was turned over? Yes. Defense Counsel had that report when he deposed Deputy Walker. Is that the same report that was prepared in 1999? That was a different report that had been prepared by, I believe, the defense's investigator. And again, with that report, they had an evidentiary hearing on that report and Deputy Walker never testified. We don't know what Deputy Walker ever heard. The closest we have is what is in Deputy Walker's report from the night of this crime that, I believe it was, she said she was told to tie his hands. And when the defense counsel testified, her saying she was told to tie his hands, to me, was completely different than her saying I tied his hands. Maybe. But that's the whole point of disclosing that information. They had that information. They had that report. I have it in my... When the defense lawyer testified at the post-conviction hearing, did he say he had that information? Yes, he did. You're sure about that? I believe. Again, I'll check it. But he's in the deposition of Deputy Walker. He has the report. And I believe I put in my brief that he did testify at the hearing that he had that. He suspected it. That's the theory that he followed. The problem is that he did it from intuition and hunch, not from having a statement, purported statement by the girlfriend that she did it, whether ordered to do so or not. Actually, no, he must have testified to it at the hearing because I know there is a place where he says saying that someone told you to tie their hands is a different statement than I tied his hands. So, yes, counsel had it. It's clear in the record during Deputy Walker's deposition that he had that report. And we have never heard from Deputy Walker afterwards whether that's exactly what she said, whether he might have made a mistake, whether she was referring to when he tossed him the shoe and asked him to remove the shoelaces and tie his hands. And even if she did tie his hands, that still doesn't make a difference in this case. That's your opinion, but that doesn't add anything to the mix, you don't think? No, I don't think it does. It may not get them to the final line, but you don't think it's relevant that the she tied his hands, if she testified at trial she tied his hands, which she didn't. That's the whole point. The whole point is that she could have been impeached with that testimony, with that statement when she testified at trial and denied doing that. I don't see how she could have been impeached with a hearsay statement, which defense counsel had. She couldn't have been asked, didn't you tell Detective X? Sure, she could have been asked that. Of course. Of course, that wouldn't be hearsay. She could have been, because trial counsel had all that information. Okay, thank you very much. You've saved your full time for rebuttal. Okay, thank you. Mr. Harrison. Good morning, Your Honor. Your Honors, may it please the court, my name is Keith Harrison. I'm with the law firm of Kroll & Moore. I'd like to start to clarify the record with regard to the various hand-tying statements in this case, and in direct response to Judge Jordan's question with regard to some of those statements. I'd like to start off by, if I may, handing to the clerk some enlarged copies of the actual notes that are at issue, and I have one version for counsel, but these are a little bit larger than what's in the transcript, what's in the appendix, and this is at Appendix I, Volume 12, page 138 through 140. These are the prosecutor's notes. I'm sorry? That's White's handwriting. Correct, Your Honor. This is prosecutor's White's notes, and this is starting at page 138 of Appendix I, and I'd like to direct the court's attention to the second page of the notes near the bottom. It's the second, it's the paragraph second from the bottom. This is the key issue, and this is the information that was not disclosed. Mark and Diane suspect girl did it. She changed her story a couple times. One thing was... I don't know where you're reading from. I'm sorry, Your Honor. This is near the bottom of page two, the second page, yes, 1300, which is in the appendix, page 139. I see Mark and Diane suspect. Suspect girl did it. She changed her story a couple times. One thing was she first, and that's hard to see, but it's a 1ST, said she tied his hands behind his back. This is the key, this was the key information that the defense did not have at trial. Now, what the state is arguing is that there was a police report in 1989 by detective, officer Walker. That police report is found at appendix H, volume 11, page 221. In that police report, officer Walker, Wade Walker, indicated that Halleck said she was told to tie the victim's hands behind his back. Not that she actually tied them behind his back, but that she was told to tie them behind his back. But isn't it a fair inference that given the circumstances that she actually did tie them, that she was told to do so by a man who was wielding a gun? Actually, Your Honor, the state court addressed that issue in the 2005 ruling. There was an ineffective assistance of counsel issue raised on that very question about whether what was in officer Walker's 1989 report was in fact impeachment. The state court ruled, and I'm quoting, the state court actually ruled that what was disclosed in the notes that you have was far different than what was disclosed in the 1989 police report. Specifically, the court ruled deputy Walker's written report specifically states Kim Halleck saying she was told to tie, and told to is in bold. This is the only emphasis added by the court in the entire 65-page opinion. Told to tie Mr. Flynn's hands behind his back with a shoestring. Emphasis supplied. This is far different than reporting that Kim Halleck  was. So the trial court ruled that what was disclosed in 1989 was not what is in these notes. That it was far different. And in fact, the trial counsel, Mr. Parker, in his testimony, he repeatedly said if I had had this information, I would have used it because it went to the heart of my case. Now the 1999 reference, Your Honor, was to FDLE subsequent investigation report. And what happened in that report in 1999, 10 years after the fact, is that Officer Walker confirmed that what is in these notes is what he recalled. And that's why 1999 is important. It's after the fact. But we know what Officer Walker would have said if he was called to testify. He would corroborate it, what's in these notes. He would have said the first thing that she said was that she tied his hands. Let me ask you this. In the initial brief of Mr. Green to the Supreme Court of Florida, the allegation was made defense counsel did not confront Halleck at trial with Deputy Walker's report that she had been the one to tie Flynn's hands. Now the presumption in that question is he knew it and it was ineffective assistance not to ask about it. So how can you claim that he didn't know? Your Honor, he didn't know, which is why he didn't do it. However, the important point there, Your Honor, is that this was a strickling, this was an ineffective assistance of counsel claim. Right, the presumption was he knew it and was ineffective for not asking her about it. Well, Your Honor, that was, that rationale was expressly rejected by the trial court and I'm talking about what is the presumption of the question and the presumption of the question is he knew it. Well, Your Honor, I actually, the presumption in the question is as to whether that... I'm not trying to trick you. I'm on page 86 of Mr. Green's brief to the Supreme Court of Florida. Yes, Your Honor. I'm familiar with that and I'm aware that there was a strickling claim based on that issue and that strickling claim was addressed by the court and rejected on the very basis that the information that was disclosed in 1989 that she was told to tie is not the same as actually tying and that it couldn't have been impeachment and therefore you can't have a situation where on the one hand it was not ineffective assistance of counsel but on the other hand it was disclosed. It was not disclosed which is why the court ruled it was not ineffective assistance of counsel for the trial counsel not to have used that to impeach. It wasn't impeachment material. It was completely consistent with her story. Being told to tie... Isn't the logical inference, the logical inescapable inference, she was told to, by a man holding a gun, his hands were tied and she tied them. Isn't that the logical inference? Your Honor, I do not believe so. It's not? No, Your Honor. The evidence says that John Doe was told to leave the room and go out the door and the evidence says he's not in the room and the door's open. He left. I'm having a hard time. Yes, Your Honor, but that's a different hypothetical actually because the facts here are that she, her first story was that she tied the hands. The second story is that the black guy tied the hands. So that she was told to tie his hands is not inconsistent with the black guy having tied the hands. It doesn't mean, I mean, we don't all do everything we're told to do. You have enough information on what was told to tie to pursue the point? Your Honor, the... Your only argument is that he didn't have in hand her statement that she tied the hands. That somehow counsel was kept from impeaching her. Your Honor, that is not the only argument with regard to the... But before the trial in this case, the deposition of Walker was taken, wasn't it? That's correct, Your Honor. Who else's deposition? There were many depositions taken, certainly Rixey and Clark's depositions. Did they depose the two detectives who speculated that she did it? Yes. Everybody was deposed because in Florida you do that. Yes. Yes. They were all deposed, but those depositions would have been completely different if these notes would have been disclosed. These notes would have been a game changer. Well, they would have asked the two detectives, why did you make the statement you thought she did it? I haven't read those depositions. I take it they're in the record. They are in the record, Your Honor. Did they ask them about it? No, Your Honor, because they didn't have the notes. Oh, no. Did they ask the two detectives why you speculated that she did it? No, Your Honor, because they didn't know that they had... Well, I'm dealing with... They knew that what they had said. No, they didn't. They didn't, Your Honor. They didn't know that. They did not know that. They knew Walker's report. Well, Walker's report... They had Walker, and Walker's report said they said. No, no, Your Honor. Walker's report merely said that Halleck indicated that she was told to tie the victim's hands. The rest of the information that she changed her story... Are you saying that prior to trial, I misunderstand the facts apparently, that prior to trial, defense counsel did not know what the two detectives thought? Absolutely. That's the crux of the matter. They thought they were standard police witnesses that were going to testify for the prosecution. The defense had no idea that these officers were challenging the thoroughness and the good faith of the investigation. These officers in these notes were trying to paint a picture for the prosecutor that they had the wrong man and that the investigation was going in the wrong direction. Defense had no idea about any of that. That would have... However this plays out, it's undisputed that this portion of the prosecutor's notes indicating the suspicions of the two investigators was never turned over. Absolutely. That part is undisputed. Whatever it leads to, that part is undisputed. They did not have that. They did not have that. They did not have that, the statement of the two investigators that they suspected the girlfriend because of some of the things she had said and some of the things they had seen. Correct. Correct your honor. And that is the crux of the Brady case. That's what Brady, Bagley, and Kiles all go to. And with regard to Kiles your honor, this case is materially indistinguishable from Kiles v. Whitley. In that case, Supreme Court case, there were notes, statements of the key witness in that case that were inconsistent. His story was evolving over time. Those notes and statements were withheld. This was also a murder case and the court ruled that that was a Brady violation. And one of the main reasons that the court ruled it was a Brady violation is because the inconsistent statements would have led or challenged the very thoroughness of the investigation as well as the good faith nature of the investigation. And that is classic Brady material under well settled Supreme Court doctrine. This case is on all fours with that decision. Ms. Neelan didn't get to this but she certainly has made the argument in her brief and I want to give you a chance to talk about it. She says that this Brady claim was not exhausted because it was not fairly presented to the Florida Supreme Court on appeal from the post-conviction court's ruling. So what is your response to that? Your honor, my response is that it was clearly fairly presented. The argument made by the state is the same argument that this court rejected last year in Deter v. Florida. And I will go to the appendix and identify specifically where the standard of fairly presenting the federal claim was met. In fact, it was exceeded. If I would direct the court's attention to appendix C and per in capital E in per in volume two, page 712. This is Mr. Green's brief to the Florida Supreme Court and I would direct the court's attention to page 712. Argument Roman numeral six. The title there is the court erred in denying Green's claim for relief based on individual instances of ineffective assistance of counsel and nondisclosure of exculpatory evidence. That's the heading. In the introductory paragraph on that same page is the statement where exculpatory evidence was suppressed or concealed. Mr. Green is entitled to relief under Brady or Giglio. That identifies the federal claim. It goes on in a subheading specifically focused on the Brady issue. The subheading on page 714 of the appendix, which is 83 of the Supreme Court opening brief, exculpatory and impeaching evidence related to the initial police investigation. It goes on on the next page, which is appendix page 715 to specifically identify the very notes that you're holding in your hand. It says a handwritten police statement dated August 28, 1989 with the names Diane Clark and Mark Rixey underlined on the front page was obtained through chapter 119. It was not disclosed to the defense at trial. It contains the following statement. Mark and Diane suspect the girl did it. She changed her story a couple of times. She said she tied his hands behind his back. This was inconsistent with Deputy Walker's recollection that Halleck had said that she was the one who actually did the tying of Flynn's hands and inconsistent with Halleck's subsequent statements and eventual trial testimony. It goes on for several pages. This is the exact same notes, the exact same argument that was presented to the district court and the same Brady claim that we are referring to today. It was fairly presented. If there was any question in a subsequent post-trial hearing, the state court denied us bringing up the Brady claim again because it had already been submitted to the court, had gone through appeal, and it was denied as being successive. It couldn't be denied as being successive if it hadn't been fairly presented in the first instance. Your Honor, I see my time is coming to a close. This is a case in which Alexander Crosley Green was wrongfully convicted 30 years ago of a crime he did not commit. One of the most dramatic instances that would demonstrate the impact of these notes is that in the closing arguments in rebuttal, the state prosecutor mocked the theory that the girl did it. In fact, the very words he used was he called it ludicrous and grasping at perhaps no straws at all. Well, the reason that that argument could be made was because these notes were suppressed. And that was a violation of the Brady rule, a violation of the Constitution. It denied Mr. Green a fair trial, and it was inconsistent with well-established federal law. Thank you very much. I see my time has expired. Thank you, Your Honor. Just in support of the fact that this claim is procedurally defaulted, between the two of us, we've been up here more than 25 minutes, and none of the arguments that have been made today were ever presented to the Florida Supreme Court. Well, let's start. They complained about the withholding of this document, did they not? In the brief to the Florida Supreme Court, they mentioned this document. Yes. They mentioned that document, and they said it was a Brady violation, right? Yes. What more do you need? No, I'm not going to agree with that. Okay. No, they never explained anything. They had their— Let's go one at a time. Let's go step by step. Did the brief filed by Mr. Green to the Florida Supreme Court identify this document as having been withheld? It was quoted. He quoted from his 3850. So it was identified. He never raised a Brady claim. For example— We need to go step by step, and you're going to have to follow with me, okay? Did Mr. Green identify—if you want to say quote, that's fine too—this document in his brief to the Florida Supreme Court? Yes. Did he claim that there was an improper withholding of this document from the defense? His claim was entitled something to the effect of he was denied an effective assistance of counsel, there was a Brady claim, and there was a Giglio claim. And that was pretty much the extent of his argument. Did he say that the Brady claim was based on the withholding of this document? If you really read into it, it could have. For example, Judge, the first question you ask is, what is this finding? Is that a correct materiality finding? That was never argued to the state court. If that's the basis of his argument, that had to have been presented to the state court. None of these arguments were ever presented to the state court. Your argument is that it wasn't the Brady claim that wasn't presented, it was the Brady theory that wasn't presented. Because what I'm hearing is that he made a Brady claim on appeal. Whatever you thought of it— Yes, he said, I have a Brady claim. And that's all he said. And he identified this document— And he said, and here's these notes. He didn't say why they were Brady material, how they provided any exculpatory evidence or impeaching evidence, how they were material. No, he never argued any of that as a discrete point in his brief. Because if he had, we'd have all those findings to rely on now. I understood your argument to be that when you make these claims, you've got to be specific as to the law and specific as to the facts you allow to support your legal interpretation. Correct. Especially with a Brady claim, because they are so factually driven and factually intensive analyses. You can't just say, here's these, it's a Brady claim. And this is not a pro se defendant who's trying to work through this on his own. This man has been represented by counsel throughout his 30 years of litigation. And yes, it's our position. We perhaps would have had an opportunity to respond in state court if he had raised these same arguments. How did you respond to it in the Florida Supreme Court? Just responded that the trial court didn't err. How? I believe it was the trial court found it wasn't admissible. I don't really know because I don't think— Okay, stop, stop. We can't interrupt each other. You say that his claim was not sufficiently detailed. Correct. How did you, the state, respond to that insufficiently detailed claim in your brief? I don't know. To be honest with you, I only read the claim that he raised, not how we responded to it. Okay. Is that relevant? If the state understood what the claim was and responded to it, does that mean that the claim was exhausted? No, no. No. It's not. No, it's not. The advocates— We have to raise the claim. The Florida Supreme Court did not address this particular Brady claim, and the Florida Supreme Court was pretty specific in addressing every single claim that he raised in his appellate brief. That's, of course, a double-edged sword, right? Because if they didn't address it and it was exhausted, you get de novo review, right? Well, get de novo review where? If the court—if the claim was exhausted, if we disagree with you the claim was exhausted and the Florida Supreme Court didn't address it, you don't get ad pedeference. Well, we do have state court factual findings that they would not have been able to testify, which I think everyone— You don't get ad pedeference on the ultimate denial of the Brady claim, right? Because it's not a claim that was adjudicated on the merits by the state Supreme— I believe it was. I believe this court's finding that this testimony would not have been admissible with no further objection to that. Everybody said, oh, yeah, their opinions would not have been admitted in this trial. I thought— So that's the end of the inquiry. I thought you said the Florida Supreme Court did not address the Brady claim. Because it wasn't raised on appeal. And if the Florida Supreme Court didn't address it and if we disagree with you on exhaustion that means the claim wasn't adjudicated on the merits, which means you don't get ad pedeference. It was adjudicated on the merits in the state trial court and he procedurally defaulted it in the Florida Supreme Court, is what my point is, my argument is. I understand the argument. Your argument is that he just didn't do enough in his brief to preserve that claim. But it's not, tagging along to Judge Traxler's question, it's not that he didn't identify this document in his brief and say that it was a Brady violation to withhold it. He quoted it. Like I said, he raised it. It was like one omnibus claim, ineffective assistance of counsel, Brady, Giglio, everything. It was a shotgun claim and he never said the trial court found that this was not Brady material because they wouldn't have been able to testify at trial and that finding was erroneous because it would have led to exculpatory evidence, it would have done this, it would have served this purpose. He never showed how this was Brady material. You can't simply quote something, particularly as the facts fell out in this case, where we have, these were not investigators, these were first responders. They never investigated anything in this case. They never talked. One of the problems with that is, in White's notes, he said, Mark and Diane suspect the girl did it. She changed her story several times. You can infer from that that Mark and Diane somehow became privy to the stories that she had been telling, somehow. We've never, in 30 years, we've never heard, it's not even in their inadmissible affidavits, these stories that they've heard. What I'm saying is, I'm just looking at Mark's notes. The notes indicate that they had some information on which they were speculating that she did it. Correct. And told him. Correct. Him, Mark. White. Correct. Okay. But they didn't. They never spoke to Kim Halleck. The only person who spoke to Kim Halleck that night was Deputy Walker. And we don't know what she told Deputy Walker. We have the hearsay statement in his report, and when they were given the opportunity to call Deputy Walker at an evidentiary hearing, they failed to do so, and the Florida Supreme Court found all those claims procedurally fired. Did they call Rixey and Clark at that same hearing? Rixey and Clark have never been called. Could they have called? The judge had already denied the claim, but if they had come back and said, we have this additional information, or, Judge, you know, it shouldn't be based solely on that, I think that the judge would have let them testify. At the hearing, they had that additional information as a result of the investigation that had been done a couple of years earlier by the, in the FDLE report. In other words, didn't that contain the information that Walker had said she tied their hands? As I understand it, and I don't have it right in front of me, yes, I do, the FDLE report was in 2000, and evidentiary hearings were in 2003, 2004. Right. That sounds about right. So they had that information at the time of the evidentiary hearings. They wanted to know what Rixey and Clark said, why they thought it, what they based their opinion on. My question is, could they have called Rixey and Clark then at the evidentiary hearing? Maybe they couldn't. I don't know. I think if they would have asked the judge. I mean, the judge had, like, six days' worth of evidentiary hearings in this case. I mean, there was, they were not stopped from presenting any evidence whatsoever. As I said, they were specifically given the opportunity to call Deputy Walker, who was the only person who heard what Kim Halleck had to say. To this day, we don't know what Kim Halleck said, except Kim Halleck. And so, any claim is based on pure speculation and hearsay in this matter. Somebody knows what she said, because White says in his notes, she changed the story several times. I don't know to whom she changed the story several times. They suspected that. We don't know. No, no, no, no, no. This is what White says. I believe that was, yeah, his claim that Rixey and Clark thought that she did it because she changed her story several times. The question is, I had was, to whom did they give the several stories? We don't know. She spoke to the police. I understand we don't know. She spoke to the police. We have all the statements she gave to the police. We have her deposition. We have her trial testimony. And the only other potential statement she made was that night when she was sitting in Deputy Walker's car, and we don't know what that statement was. Was White deposed on habeas? White. I don't believe so. But I don't recall. I can't tell you for sure. But they had this document long before that. They had it at trial. No, they did not have this document at trial. They had it, excuse me, they had it before the habeas hearing. Correct. But he wasn't deposed. Not as far as I know. So I see I've like way overrun my time. Thank you very much. Let me ask one more question. Okay. This has to do with the, my question has to do with the Florida Supreme Court's decision in 2008. My reading of that opinion is that they treated the exception raised by the defendant as a ineffective assistance of counsel claim. And as was pointed out, they perhaps didn't directly address the Brady claim. So if a Supreme Court doesn't rule on a particular issue, what do you do then? Let's just say, just assume for the purpose of my question, they didn't rule specifically on the Brady question. Because it wasn't raised as a Brady claim. Okay. Well, where was it raised? Where was it appropriately raised? The Chris White's notes was raised in the trial court on the 3850. And the trial court ruled? Correct. Let's presume when it went to the Supreme Court, the Supreme Court didn't rule. So do you go back and look at the state trial judge's decision? Or do you look somewhere else? You don't look anywhere. It's procedurally defaulted. He's asking you to assume, I think, that something was raised in one way, shape, or form. And the Florida Supreme Court doesn't address it in any way whatsoever. Because at that point, you're not dealing with procedural default. The Florida Supreme Court has a claim presented to it in one way, shape, or form. It doesn't address it, expressly at least, right? Correct. As long as it was raised. As long as it was fully and fairly presented to that court. Forget what's being raised now. Let's assume we're in front of the Florida Supreme Court. They have a claim based on this document and Brady. However thin you think that claim is. I don't think it's any claim. Not even just a thin claim. Okay. The court has something alluding to this document and the word of a case named Brady. You agree with me so far? Yes. The Florida Supreme Court does nothing with that expressly. Agree with me on that? Well, they ruled on the ineffective assistance of counsel portion. Without mentioning this. Correct. So Judge Traxler's question, if I'm wrong he can correct me. You're doing good. Okay. I'm learning, I'm learning. What does this court do with a claim, however poor you think it was, that was not expressly addressed by the Florida Supreme Court as a habeas court now under AEDPA? What do we do with that? Well first you'd have to find that it was fairly raised and exhausted in the state court. We are assuming for purposes of the question only that it was. The question is. Look back to the state trial court findings. I mean that's what Sellers said. When you have a summary affirmance. This is not a summary affirmance. That part, this portion of it was. They don't say we reject all of Mr. Green's other claims without discussion because. The Florida Supreme Court. Yes, that's what I'm talking about. No, I think you can look back. Sure you can look back with the last state court findings. Even if the Florida Supreme Court chooses not to address a claim? Yes. What case says that? I believe that's what Sellers says. You can look through. The last state court findings. If you have a summary affirmance. This is not a summary affirmance. It's no address at all. It would be a summary affirmance of that claim though. How do you know? If the court doesn't mention it. Even knows it's there. The court has claims 7. 1 through 7 in a brief. Okay. 1 through 7. The Supreme Court of Florida says. Mr. Green has raised 6 claims. 1 through 6. They miss 7. They don't address 7. What do we do with 7? I think then if that were the case in here. I would argue it was waived. If they said we only address 6 of the 7 claims. I think you would have to do rehearing. And say to the court. You missed one of my claims. And if they say. Rehearing denied. Now what do we do? Then I think you have to demonstrate that the claim was properly raised in that court. I'm assuming that it was. I'm assuming that it was. Because it's claim number 7 in the brief. You're fighting me on the hypotheticals. But that's not the purpose of the question. Of course. That's why it's called a hypothetical. Why don't you answer the question that the judge is asking. I'm trying to. No. I'll put it to you. The claim is raised in the brief to the Supreme Court of Florida. With some others. Point 1. Point 2. The Supreme Court affirms the trial court on habeas. Point 3. It does so without saying a word about claim 7. You got that? Yes. The question is what do we do? I think what you can do is look to the last state court opinion. That wrote on the matter. Which in this case would be the state trial court. Okay. Thank you very much for your help. Thank you. For both of you. We really appreciate it. If I may beg the courts indulgence. There's a citation in the record. To answer Judge Pecker's question. On what? With regard to whether Rixey and Clark could have been called to testify. With regard to the judge denied an evidentiary hearing on Rixey and Clark and the Brady claim. That can be found in appendix F volume 5 page 93. The court denied an evidentiary hearing on Rixey and Clark and this portion these notes. There was no evidentiary hearing held. Anything else you want to say on that point? Ms. Nealon, I don't want to leave you without a word. Thank you both so much. Thank you. Thank you. Thank you.